WELLS FARGO ADVANTAGE NATIONAL
TAX FREE FUND, et al.,                    Case No. 2:08-cv-15162

       Plaintiffs,                    HONORABLE STEPHEN J. MURPHY, III

v.

HELICON ASSOCIATES, INC., a Michigan
Corporation, et al.,

       Defendants.
_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT DORSEY & WHITNEY LLP'S MOTION TO DISMISS [docket
number 15]; GRANTING THIRD PARTY DEFENDANT CRESCENT
ACADEMY'S MOTION TO DISMISS THE THIRD PARTY COMPLAINTS OF THE
UNDERWRITERS AND OF DARNELL & MEYERING, P.C. [docket numbers 58
and 59]; GRANTING DEFENDANT GILLIAM'S MOTION TO STAY THE CASE
AS TO HIM DUE TO BANKRUPTCY [docket number 74]; DENYING
DEFENDANTS HELICON AND WITUCKI'S MOTION TO STAY DUE TO
THE BANKRUPTCY OF DEFENDANT GILLIAM [docket number 75];
DENYING AS MOOT DEFENDANTS' EMERGENCY MOTION TO
ALLOW THE DEPOSITION OF MICHAEL WITUCKI [docket number 76]; and
GRANTING PLAINTIFFS' MOTION TO SUBSTITUTE PARTY [docket number 82]**

**INTRODUCTION**

This litigation arises out of the issuance, sale and purchase of municipal revenue bonds

in the face value of $7,090,000  (the "bonds") in December 2006 to finance the $5 million

purchase of a school building for a charter school.  The plaintiffs are a number of municipal

bond mutual funds that purchased the bonds allegedly in reliance upon disclosures

contained in a Preliminary Official Statement and an Official Statement, both of which were

drafted by defendant Dorsey & Whitney LLP in its role as underwriters' counsel.  The

plaintiffs allege that the Official Statements, the Financial Statements and the Financial

Forecast contained misrepresentations of material facts and failures to disclose material

facts, including that the Bond issue was illegal, the issuance of the bonds violated the school's charter contract, various conflicts of interest, inflated student enrollment, an inflated price being paid for the school building and the use of "equipment leases" to conceal historic cash flow problems at the charter school.  As relevant to the motions before the Court, plaintiffs bring suit under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, state securities statutes of Michigan, Connecticut, Texas, New Jersey, Massachusetts, and Wisconsin, aiding and abetting common law fraud, and negligent misrepresentation.

One of the defendants is Dorsey & Whitney, LLP, (the "Dorsey Firm") who was counsel to the underwriters in the bond transaction and also issued a special tax opinion in connection with the underwriting.  The Dorsey firm has moved to dismiss all counts of the complaint against it as a defendant.  It argues that all the claims should be dismissed because Dorsey, as underwriter's counsel, did not owe a duty to the defendants for purposes of the relevant federal and state laws, because Dorsey was not a "seller" or "agent" of the seller for purposes of the state securities laws and did not have an interest in the transaction, because the plaintiffs did not allege their claims with sufficient particularity as to Dorsey and because the facts do not support a claim for negligent misrepresentation as against Dorsey.

Defendants Herbert J. Sims & Company, Inc. ("Sims") and Municipal Capital Markets Group, Inc. ("MCM") (collectively, "the Underwriters") and defendant Darnell & Meyering P.C. ("Darnell") have each filed third party complaints against Crescent Academy for breach of contract, indemnification, contribution and unjust enrichment.  Crescent has moved to dismiss the third party complaints for failure to state a claim, arguing that the

facts do not state viable claims against Crescent and that Crescent, as a public school academy, cannot be held bound to any indemnification agreements.

Finally, this order addresses two motions to stay the litigation due to the bankruptcy of one of the defendants, an emergency motion to take the deposition of one of the defendants, Michael Witucki, and a motion to substitute the estate of Mr. Witucki as party defendant because of the recent death of Mr. Witucki.

## FACTS

The complaint alleges the following facts: Crescent Academy ("Crescent") is a Michigan Public School Academy[1] that was managed by defendant Helicon Associates ("Helicon") and chartered by Bay Mills Community College ("Bay Mills"). Defendant Michael Witucki was the president and principal owner of Helicon and was also the manager of SAAS Development, LLC ("SAAS"). Defendant Jeremy Gilliam was a member of SAAS and an employee or agent of Witucki. Complaint ¶¶ 15-16. It appears from the complaint that although Crescent was chartered by Bay Mills, it essentially was a creature of Helicon, in that Helicon was Crescent's sole consultant and educational services provider and operated Crescent through a consultancy services agreement. Complaint ¶ 14. The complaint likewise portrays Helicon as a creature of Witucki's, its president and principal owner. Witucki, acting through Helicon, caused himself to be named as Chief

---

[1]A Michigan public school academy is essentially a charter school, authorized and organized under M.C.L. § 380.501 *et seq.* See generally *Council for Organizations and Others for Educ. About Parochiaid, Inc. v. Governor*, 455 Mich. 557, 565 (1997). It is considered a public school for purposes of Section 2 of Article VIII of the State Constitution, a school district for purposes of section 1225 and 1351a and is subject to the leadership and general supervision of the state board over all public education under Section 3 of Article VIII of the State Constitution and is a body corporate and a governmental agency. MCL § 380.501(1). A charter school is a school managed by private interests and financed primarily with local school district funds. Am. Jur. Schools § 3.

Administrative Officer of Crescent Academy and caused Gilliam to act as Recording Secretary to the Crescent Academy Board of Directors. Complaint ¶ 15. Kevin Foley, of defendant Foley & Robinette P.C. (the "Foley Law Firm"), was initially a member of SAAS, but resigned his membership and became counsel to Crescent Academy beginning in the 2005-2006 school year. Complaint ¶ 80. Helicon caused the Foley Law Firm to act as counsel to Crescent Academy in connection with the purchase of the School Building and the underwriting and issuance of the Bonds. Complaint ¶ 22.

SAAS was the owner of the School building and at first was Crescent's landlord. Subsequently, in a series of transactions at issue in this litigation, SAAS sold the school building to Crescent for the allegedly inflated price of $5,000,000. SAAS purchased the building, which was an existing office building, in May 2004 for $1.8 million, or $77 per square foot. SAAS then agreed with Crescent and Helicon to renovate the building to be the K-8 building for the proposed charter school to provide for 20-25 classrooms. Complaint ¶ 50. SAAS then leased the school building to Crescent in May 2004, at an allegedly inflated rate, in a lease signed by Witucki as manager of SAAS, and SAAS began the proposed renovations. The renovations resulted in a school facility that contained only 15-16 classrooms. Complaint ¶ 57.

Crescent developed cash flow problems prior to 2006 that were allegedly disguised by Helicon by the creation of equipment leases at the end of each school year. Complaint ¶ 65-66. The equipment leases aggregated equipment purchased by Crescent with its own funds during the school year, and, at the end of the school year, Helicon caused Crescent to sell this equipment to Helicon and Helicon then leased it back to Crescent. Complaint ¶ 67. These equipment leases were called capital leases in the Official Statements, but

were really a disguised form of cash-flow borrowing, devised to disguise Crescent's cash-flow deficiencies.  Complaint ¶ 68-69.

SAAS, operating through Witucki, proposed to Crescent (also operating through Witucki) that Crescent purchase the school building from SAAS for $5 million and finance the purchase through the issuance of the Bonds, and also use the Bonds to pay off the equipment leases.  Complaint ¶ 75.  Helicon caused Crescent to accept SAAS's proposal. The plaintiffs allege that these proposed transactions created egregious and irreconcilable conflicts of interest that needed to be but were not disclosed in the Official Statement (which is essentially the Bond's prospectus).

Crescent, Helicon and SAAS proceeded with the proposed transactions and hired various individuals and entities to assist.  Defendants Sims and MCM were hired as underwriters for the proposed bond issue.  Complaint ¶¶ 17-18.  Sims and MCM retained defendant Dorsey to act as underwriter's counsel.  The Dorsey law firm also served as special tax counsel in connection with the underwriting and offering of the bonds.  The Dorsey firm, in its capacity as underwriter's counsel, was one of the principal authors of the Official Statement.   Dorsey, in its capacity as special tax counsel, also issued an unqualified legal opinion that interest on the bonds was not subject to federal income taxation.  Complaint ¶ 19.  Darnell & Meyering was hired by Crescent (through Helicon and Witucki) to audit Crescent and to prepare Crescent's annual financial statements required by law.   The Foley Law Firm was hired to represent Crescent Academy with respect to the purchase of the School Building and the issuance and underwriting of the Bonds. Complaint ¶ 22.

Sims, MCM, the Dorsey Law Firm and the Foley Law Firm determined that Crescent Academy could not purchase the School Building or directly issue the bonds unless another

entity which had those abilities took title to the School Building on behalf of Crescent and served as a conduit issuer of the Bonds. Complaint ¶ 138. The defendants decided to have the Charles Doctor Drew Academy ("Drew Academy"), another Michigan charter school, take initial title to the School Building by purchasing it from SAAS and then sell it to Crescent Academy, and act as conduit issuer of the Bonds. Drew Academy also purchased its school building from a company owned and managed by Witucki and financed through the issuance of municipal bonds issued, underwritten and sold with the participation of defendants Witucki, Gilliam, Foley, Sims, MCM, the Darnell CPA Firm and the Dorsey law firm. The Drew Academy Bonds were issued on November 20, 2006, about three weeks prior to the issuance of the Crescent Academy Bonds. Complaint ¶ 151. Central Michigan University never gave its approval for Drew Academy to take title to the Crescent Academy School Building or to act as conduit issuer for the Crescent Academy Bonds. According to the complaint, the defendants all allegedly knew this but still caused Drew Academy to act as conduit issuer and to take title to the Crescent Academy School Building. Complaint ¶ 150-151.

The Foley Law Firm issued an opinion to Sims, MCM and the trustee for the Bonds in connection with the issuance of the Bonds (the "Foley Legal Opinion") that opined that the issuance of the Bonds and Crescent's financing of the School Building purchase did not violate Michigan law, did not violate the Charter Contract, and that, in all respects, the issuance of the Bonds and the School Building purchase were validly authorized. Complaint ¶ 24.

The Complaint alleges that the Official Statements contained false and misleading statements of material fact, including failing to disclose the various conflicts of interest between Witucki, Gilliam, Foley and the Foley Firm, Helicon, SAAS and Crescent in

connection with the lease and sale of the School Building; violations of Michigan law; violations of the charter contracts of both Drew Academy and Crescent Academy; and the lack of prior written approval by Central Michigan University and Bay Mills of the transactions that would likely result in the revocation of the Crescent Academy Charter Contract and the consequent inability of Crescent Academy to pay principal and interest on the Bonds.

The Official Statements were provided by Sims and MCM in connection with the underwriting of the Bonds and were authored by Sims, MCM and the Dorsey Firm. Complaint ¶ 204. The Official Statements represent that "All information contained in this Official Statement and exhibits hereto pertaining to Crescent have been furnished by Crescent or Helicon for use herein" and "All information in this Official Statement and exhibits hereto pertaining to Helicon have been furnished by Helicon." Complaint ¶¶ 201-202.

The Official Statements also contain the following provision, capitalized, on page ii:

ALL INFORMATION CONTAINED HEREIN HAS BEEN OBTAINED FROM DREW, CRESCENT, DTC AND OTHER SOURCES WHICH ARE BELIEVED TO BE ACCURATE AND RELIABLE, BUT NO REPRESENTATION, WARRANTY, OR GUARANTEE IS MADE AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION IN THIS OFFICIAL STATEMENT.

After the Bonds were issued, Crescent's chartering entity, Bay Mills, became aware of the various issues surrounding the Bonds and their illegality under Michigan law and issued a "Notice of Intent to Revoke" Crescent's charter contract in April 2007. Complaint ¶ 8. Revocation would result in the complete failure of Crescent Academy and leave the School Building, which was only worth about $3.2 million, as the only security to pay the Bonds, whose outstanding par value was over $7 million. In response, Crescent Academy issued a "Plan of Correction" which required, in part, that the Bonds be "unwound" by

cancelling the $7,090,00 in Bonds and issuing a separated $3,200,000 bond financing in April 2008. This resulted in out-of-pocked damages to the Funds of approximately $3,890,000. Complaint ¶ 9.

The Funds filed this suit against Helicon, the Darnell CPA Firm, the Foley Law Firm, Sims, MCM, the Dorsey law firm, Witucki, Gilliam and Foley in December 2008. Plaintiffs allege that the defendants, including the Dorsey Firm, failed to disclose that Witucki and Gilliam worked for and controlled Crescent, Helicon and SAAS and therefore had conflicts of interests in the transactions between those entities. Complaint ¶¶ 38-49, 100. Plaintiffs allege that the Dorsey firm knew or should have known about and disclosed these conflicts of interest because Dorsey reviewed documents showing Witucki and Gilliam concurrently worked for Crescent, Helicon and SAAS. Complaint ¶¶ 40, 47, 154, 282, 295-96. Plaintiffs also allege that Dorsey knew or should have known about other problems with the Bond transactions, including that using Drew Academy as conduit issuer was a "highly unusual procedure" and was not "clearly" permitted by Michigan law, that Central Michigan University could revoke Drew's charter if Drew violated its charter or Michigan law, and that Central Michigan University had not approved Drew's role as conduit issuer for Crescent Academy and might not agree with the Dorsey firm's opinions on the legitimacy of the conduit issue. Complaint ¶¶ 288-291. The complaint alleges that Dorsey knew that Bay Mills did not approve in writing the Bond issue which "could be viewed by Bay Mills as a violation of the Crescent Academy's Charter Contract." Complaint ¶¶ 293-94.

Crescent Academy is not a defendant in the main suit by the bondholders, but is a third party defendant in this action. Defendants Sims and MCM (collectively "the Underwriters") and the Darnell CPA Firm have each sued Crescent as a third party defendant.

In their third party complaint, the Underwriters assert that they were retained by Crescent to act as underwriters and assist Crescent in obtaining financing for the acquisition of the school building. Underwriter's Third Party Complaint, ¶ 4. The Underwriters assert that, in preparing the Official Statements and proceeding with the underlying transactions, the Underwriters reasonably relied upon information, representations of fact and warranties provided by Crescent. *Id.* ¶ 6. Specifically, and in order to induce the Underwriters to enter into the Certificate Purchase Agreement and to make the offering and sale of the Certificates, Crescent represented and warranted that:

1. It has all necessary power and authority to enter into and to perform its duties related to the transactions;

2. Its execution of the documents and compliance therewith would be duly authorized by all necessary corporate action and would not constitute a breach of or default under any law, administrative regulation, decree, resolution, charter, bylaw or agreement to which it was bound;

3. No other approvals or authorizations were required;

4. The information contained in the Official Statement relating to Crescent was true and correct in all material respects and did not contain any untrue or misleading statement of material fact or omission; and

5. Crescents representations and warranties would remain true and correct on the date of closing.

The Underwriters' Third Party Complaint, ¶ 7.

Crescent also agreed to indemnify and hold harmless the Underwriters against any losses arising out of any information contained in the Official Statement that was untrue or incorrect in any material respect. Underwriters' Third Party Complaint ¶ 26. The

Underwriters provided Crescent with a copy of plaintiffs' complaint in the original action and demanded that Crescent defend, indemnify and hold the Underwriters harmless from plaintiffs' claims. Underwriters Third Party Complaint ¶ 28.

The Darnell CPA firm asserts in its third party complaint that Crescent never informed it that it intended to include the Financial Statements produced by Darnell in an Official Statement for the purposes of selling securities and that including the Financial Statements in an Official Statement for the purposes of selling securities was a breach of Crescent's contract with Darnell. Darnell also asserts that Crescent's failure to tell Darnell of its intended inclusion of the Financial Statements in an Official Statement for the purposes of selling securities constituted silent fraud, innocent misrepresentation, negligent misrepresentation or fraud.

The Underwriters' third party complaint against Crescent asserts six counts. Count I is a claim for breach of contract; Count II asserts a claim for misrepresentation; Count III is a Negligence claim; Count IV is a claim for indemnification based upon the indemnification agreement in the Certificate Purchase Agreement; Count V is a claim for contribution and Count VI is a claim for unjust enrichment.

The Darnell CPA Firms' third party complaint against Crescent also asserts six counts: Count I and Count II are claims for breach of contract; Count III is a claim for misrepresentation; Count IV is a negligence claim; Count V is a claim for contribution and Count VI is a claim for unjust enrichment.

Crescent now moves to dismiss both third party complaints.

## LEGAL STANDARD

In assessing a motion brought pursuant to Rule 12(b)(6), the Court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable

inferences from those allegations in favor of the non-moving party. *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). To determine whether a plaintiff has stated a claim, the Court will examine the complaint and any written instruments that are attached as exhibits to the pleading. Fed. R. Civ. P. 12(b)(6) & 10(c). Although the pleading standard is liberal, bare assertions of legal conclusions will not enable a complaint to survive a motion pursuant to Rule 12(b)(6). *Bishop*, 520 F.3d at 519.

Although "a complaint need not contain 'detailed' factual allegations, its '[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949-50 (2009) (citing *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim is context-specific, and requires the reviewing court to draw on its experience and common sense. *Id.* at 1950. Where the facts pled do not permit the court to infer more than the mere possibility of misconduct, the complaint has failed to show that the pleader is entitled to relief. *Id.*

> Courts considering motions to dismiss may begin
>
> by identifying allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 129 S.Ct. at 1950. The Court will grant a motion for dismissal pursuant to Rule 12(b)(6) only in cases where there are simply not "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## ANALYSIS

### I. Dorsey and Whitney LLC's Motion to Dismiss

The first motion before the Court is defendant Dorsey and Whitney LLC's motion to dismiss all counts of the complaint as to Dorsey. In its motion, Dorsey essentially argues that its role drafting the Official Statements as underwriters' counsel is insufficient to create liability to the plaintiffs under relevant federal and state securities statutes or on the plaintiffs' common law claims of aiding and abetting and negligent misrepresentation. As discussed below, the Court agrees with Dorsey as to all claims with the exception of the negligent misrepresentation claim and will dismiss all claims against Dorsey except for those set forth in the Ninth Claim for Relief.

### A. Does the plaintiffs' complaint state a federal securities law claim as to Dorsey?

The First Claim for Relief asserts a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 against all defendants. Dorsey makes several arguments as to why the First Claim for Relief should be dismissed as to Dorsey, but the Court will not reach all of those arguments because it finds that the first argument is dispositive of the claim: the complaint fails to sufficiently plead the element of scienter as to Dorsey and therefore the federal securities claims must be dismissed as to that defendant.

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered ... any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  "Under Rule 10b-5, it is illegal for one '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . .' 17 C.F.R. § 240.10b-5."  *Ley v. Visteon*, 543 F.3d 801, 806 (6th Cir. 2008).

  To state a claim under Section 10(b) or Rule 10b-5, "a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied upon by plaintiffs; and (5) proximately causing them injury."  *Ley*, 543 F.3d at 806 (quoting *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (other citations omitted).

    A 10b-5 claim is a fraud claim and therefore Federal Rule of Civil Procedure 9(b) applies, requiring that fraud allegations be stated with particularity.  Pleading a 10b-5 claim is further tightened by the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), which establishes strict pleading requirements for Rule 10b-5 claims.  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 313 (2007).  The PSLRA requires that to plead a claim based on a false or misleading statement, a complaint  must:

> (1) ... specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed [and]
> (2) ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

>    15 U.S.C. § 78u-4(b)(1),

    The statute "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'"  *Tellabs*, 551 U.S. at 313 *(quoting Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 194 and n. 12 (1976)).  While the PSLRA does not define what constitutes scienter, the Sixth Circuit has explained that "knowing and deliberate intent to manipulate, deceive or defraud, and recklessness may constitute scienter." *Ley,* 543 F.3d at 809 (citing *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999).  Facts that are pled that constitute mere negligence cannot create a claim under rule 10b-5.  *Ernst & Ernst*, 425 U.S. at 214.

The Supreme Court has given the following guidance to district courts considering a motion to dismiss a § 10b action for failure to adequately allege scienter.  As an initial matter, the court must accept all factual allegations in the complaint as true.  *Tellabs*, 551 U.S. at 322.  Second, the court must consider the complaint in its entirety, as well as other sources appropriate on a motion to dismiss such as documents incorporated into the complaint by reference and matters of which a court may take judicial notice.  *Id.* at 323.  The inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (citations omitted).  Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.*  The court must consider plausible, nonculpable explanations for the defendants' conduct, as well as inferences favoring the plaintiff." *Id.* at 324.  The complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' - it must be cogent and compelling, thus strong in light of other explanations." *Id.*

In *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (overruled on other grounds by *Tellabs)*, the Sixth Circuit identified nine non-exhaustive factors that a court may consider as probative of scienter in securities fraud cases.

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Ley v. Visteon Corp.*, 543 F.3d 801, 810 (6th Cir. 2008) (citing *Helwig*, 251 F.3d at 552).

Applying these factors to the allegations in the complaint, the Court finds that the facts alleged are insufficient to create a cogent and compelling inference that the Dorsey law firm acted with scienter. First, the allegations that "Dorsey" reviewed the Consultancy Agreement and the board minutes and "learned" that Witucki was President of Helicon and Chief Administrative Officer of Crescent Academy are legal conclusions that are not entitled to a presumption of truth under *Twombly* and *Iqbal*. The Dorsey firm is an organization, not an individual. The complaint does not allege how the firm acquired the documents at issue, who at the firm reviewed them, when or where the attorneys acquired and reviewed the documents, or any evidence that members of the Dorsey firm recognized the importance

of the facts that plaintiffs allege should have alerted them to the conflicts. There are no allegations in the complaint that suggest that Dorsey had any interest in the success of the offering itself aside from the fee that it would earn from the transaction; there are no facts showing that Dorsey created internal documents that diverged from its external statements; there is no evidence of bribery. The allegations do not explain why the firm had a motive to defraud or how exactly it learned of the other parties' alleged misconduct.

The fact that Dorsey earned fees from its services as underwriters counsel and special tax counsel does not raise an inference of scienter. In *Ley v. Visteon*, the Sixth Circuit rejected an argument that an inference of scienter could be raised from the fact that an auditor earned significant fees from its relationship with a client and wished to continue earning fees. The Court of Appeals held that such facts at best set forth a motive for the auditor to have engaged in fraud and "[b]are allegations of motive are insufficient to adequately plead scienter," absent facts showing that the auditor's fees were more significant than its fees from other clients or that revenue from that particular client represented a significant portion of the auditor's income. *Ley*, 543 F.3d at 816 (quoting *Fidel v, Farley*, 392 F.3d 220, 232-33 (6th Cir. 2004) (overruled on other grounds by *Tellabs*)). The facts alleged here support at most an inference of negligence on the part of the Dorsey firm in failing to find or recognize the importance of the conflicts of interest alleged, on which it is insufficient to base a claim for securities fraud.

In conclusion, the Court holds that plaintiffs have failed to plead facts giving rise to a strong inference of scienter as to the Dorsey firm, and therefore the Court will not reach the additional arguments asserted by the parties. The First Claim for Relief will therefore be dismissed as to Dorsey.

B.  Does plaintiff's complaint state a claim against Dorsey under state securities laws in Michigan, Connecticut, Texas, New Jersey, Massachusetts and Wisconsin?

The plaintiffs also assert claims for securities law violations under the laws of Michigan, Connecticut, Texas, New Jersey, Massachusetts and Wisconsin.  See Complaint ¶¶ 409-414 (Michigan Uniform Securities Act); Complaint ¶¶ 415-420 (Connecticut Uniform Securities Act); Complaint ¶¶ 421-426 (Texas Securities Act); Complaint ¶¶ 427-432 (New Jersey Uniform Securities Act); Complaint ¶¶ 433-438 (Massachusetts Uniform Securities Act); Complaint ¶¶ 439-444 (Wisconsin Uniform Securities Act).  Dorsey has moved to dismiss each of these claims as against it, arguing that the state securities statutes require the defendant to be a "seller" or "agent" of a seller of securities or a party that "urged" the plaintiff to purchase securities and the Dorsey Firm was none of these.  For the reasons stated below, the Court agrees with Dorsey and will dismiss these state securities law claims as to Dorsey.

1.  Michigan

Dorsey moves to dismiss the Third Claim for Relief as to Dorsey on the grounds that the Michigan securities statute at issue, Mich. Comp. Laws 451.810(a)(2),[2] does not create a cause of action against Dorsey under the facts alleged in the complaint.  The statute imposes liability on a person who

> Offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he or she did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

---

[2]The Michigan statute that plaintiffs rely upon to impose civil liability, Mich. Comp. Laws 451.810, was repealed effective October 1, 2009 and replaced by The Uniform Securities Act, Mich. Comp. Laws 451.2101 et seq.  See Mich. Comp. Laws 451.2702.  The provisions of the prior statute apply to this action.  See Mich. Comp. Laws 451.2703.

Mich. Comp. Laws 451.810(a)(2) (2002). The language closely tracks the language of Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), and those few courts in Michigan that have addressed the issue have applied the analysis of the Supreme Court in *Pinter v. Dahl*, 486 U.S. 622 (1988) to the question of which parties to a sale of securities have potential liability under Section 451.810(a)(2). See *Montcalm County Bd. of Comm'rs v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225, 1230-31 (W.D. Mich. 1993); *Mercer v. Jaffe, Snider, Raitt & Heuer*, P.C., 713 F. Supp. 1019, 1028 (W.D. Mich. 1989). This Court finds the reasoning of these decisions persuasive and will apply their standards here. The "substantial factor" analysis urged by the plaintiff in this case, as the Supreme Court recognized in *Pinter,* is not grounded in the language of the statute.

Under the *Pinter* analysis, a "non-owner cannot be a seller unless he urges a prospective purchaser to buy" securities, which requires the defendant to have "actually contacted a buyer and urged the buyer to purchase" the securities. *Montcalm County*, 833 F. Supp. at 1232 (quoting *Smith v. American Nat'l Bank & Trust Co.*, 982 F.2d 936, 941 (6th Cir. 1992). The Court agrees with Dorsey that the facts alleged in the complaint do not support an inference that Dorsey was either a seller or urged the buyers to purchase the securities at issue here, and therefore the Court will dismiss the Third Claim for Relief as to Dorsey.

2. New Jersey, Massachusetts and Wisconsin

The New Jersey, Massachusetts and Wisconsin statutes are substantially the same as the Michigan statute, and all three have been interpreted by courts to not permit aiding and abetting liability; the claims against Dorsey based upon the laws of these jurisdictions will therefore also be dismissed.

### a. New Jersey

New Jersey applies the *Pinter* analysis to the question of who is a seller for purposes of liability under N.J.S.A. 49:3-71. *Zendell v. Newport Oil Corp.*, 544 A.2d 878, 882-83 (N.J. 1988). The New Jersey courts have held that a seller of a security includes both an owner who passes title or other interest in a security for value and a person who, motivated in part by his own financial interest or the interest of the securities' owner, successfully solicits the purchase of a security. *Id.* The Appellate Division in *Zendell* addressed specifically the question of whether a law firm that provided legal assistance in a limited partnership offering could be held liable under section 49:3-71, and held that a defendant is not a "seller" if it had no contact with the plaintiff, did not act as a broker or selling agent, and had no financial investment in the securities. *Id.* at 883.

There are no allegations here that Dorsey had any contact with the plaintiffs, acted as a broker or selling agent, or had any financial investment in the securities. The Court therefore finds that Dorsey is not a "seller" for purposes of N.J.S.A. 49:3-71, and will therefore dismiss the Fourth Claim for Relief as to Dorsey.

### b. Massachusetts

Massachusetts courts apply the *Pinter* analysis to claims brought pursuant to MGLA 110A § 410(a)(2) (2008). Those courts have held that for a defendant to be liable under Section 410(a)(2), the defendant must solicit a purchase "'motivated at least in part by a desire to serve his own financial interests or those of the securities owner.'" *Cohn v. State Street Bank & Trust Co.*, 893 N.E.2d 425, 431 (Mass Ct. App. 2008) (quoting *Stolzoff v. Waste Sys. Int'l, Inc.*, 792 N.E.2d 1031 (Mass Ct. App. 2003) (other citations omitted). As discussed above, there are no allegations that Dorsey had a financial interest in Crescent

Academy or the Bond issuance, or that it was a "seller" or an "agent" of the seller, and therefore the Seventh Claim for Relief will be dismissed as to Dorsey.

### c. Wisconsin

Plaintiffs' Eighth Claim for Relief asserts a claim against Dorsey under Section 551.59 of the Wisconsin Uniform Securities Act.[3]  Civil claims under the Wisconsin statute are limited to those against a defendant who "offers or sells a security." Wis. Stat. § 551.59(1)(a).  Wisconsin looks to federal law as persuasive authority for interpreting this statute.  *Carney v. Mantuano*, 554 N.W.2d 854, 857 (Wis. App. 1996).  The Wisconsin Court of Appeals has determined that attorneys who render legal advice or who draft documents for use in securities transactions are not subject to civil liability under the Wisconsin statute.  *Rendler v. Markos*, 453 N.W.2d 202, 206 (Wis. App. 1990).

The facts in the complaint as to Dorsey allege no greater involvement in the sale of the security than the normal advisory activities of attorneys.  *Cf. Rendler*, 453 N.W.2d at 206 (a claim under Section 551.59 "is not intended to cover professionals such as attorneys engaging in their traditional advisory functions").  The complaint therefore fails to state a claim against Dorsey under the Wisconsin Uniform Securities Act and the Eighth Claim for Relief will be dismissed as to Dorsey.

### 3. Connecticut and Texas

The Connecticut and Texas statutes at issue are somewhat different than those of Michigan, New Jersey, Massachusetts, and Wisconsin, in that liability under the

---

[3]The Wisconsin Statute relied upon by plaintiff, Wis. Stat. § 551.59, like the Michigan Act, has been repealed and superceded by the Wisconsin Uniform Securities Law effective January 1, 2009.  As with the Michigan Act, the earlier version of the statute is applicable to this action.  Wis. Stat. § 551.703.

Connecticut and Texas statutes is extended beyond the primary actors to encompass a person who "materially assists" an offerer or seller in the sale of securities.

a. Connecticut: Section 36b-29(a)(2) of the Connecticut Uniform Securities Act

The Fourth Claim for Relief asserts a claim against Dorsey under Section 36b-29(a)(2) of the Connecticut Uniform Securities Act, Conn. Gen. Stat. § 36b-29(a)(2). The Connecticut statute provides that

> Any person who ... offers or sells **or materially assists** any person who offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact ... is liable to the person buying the security.

Conn. Gen. Stat. § 36b-29(a)(2) (emphasis added). The Connecticut statute therefore imposes aiding and abetting liability on parties who materially assist sellers. *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 99-100 (D. Conn. 1994) (interpreting predecessor statute Conn. Gen. Stat. § 36-498(a)).

To establish liability of a primary violator under section 36b-4,

> the buyer must prove: (1) that the primary violator offered or sold a security by means of either an untrue statement of material fact, or an omission to state a material fact necessary to make any statements made, in the circumstances of their making, not misleading; and (2) that the buyer did not know of the untruth or omission.

*Connecticut Nat'l Bank v. Giacomi*, 699 A.2d 101, 118 (1997).

To prove "material assistance," a plaintiff must prove than an aider or abettor "materially assisted the primary violator: (1) in the offer or sale; and (2) in the violation by which the primary violator accomplished the offer or sale." *Id.* at 119. The buyer must also meet a burden of production that the aider and abettor "knew or should have known" of the untruth or omission, and, if the buyer does so, the burden shifts to the alleged aider and abettor to "persuad[e] the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.* The Connecticut courts have found that intent to defraud or recklessness is not required to state a claim under section

21

36b-4, and that an aiding and abetting claim may be premised upon mere negligence. *Papic v. Burke*, 965 A.2d 633, 644 (Conn. App. 2009); *Lehn v. Dailey*, 825 A.2d 140, 147-48 (Conn. App. 2003) (interpreting Conn. Gen. Stat. § 36b-5).

Dorsey relies upon *Berti v. Harlan*, 2000 WL 1474882 (Conn. Super. Sept. 22, 2000) for the proposition that a plaintiff must meet a burden of production as to whether the aider and abettor knew or should have known of the untruth or omission and "[a] simple pleading of knowledge will not suffice." *Berti,* 2000 WL 1474882 at *4. The complaint here, however, alleges specifically that Dorsey had access to the documents that established the conflict of interest between Crescent, Helicon and the individual defendants, that the firm had a duty to review the documents and in fact members of the firm did review the documents but failed to alert the plaintiffs to such conflicts of interest. This is distinguishable from the allegations in *Berti* that the wife of a stockbroker who sold defective stock "knew or should have known" about her husband's false statements. The Court determines, therefore, that the complaint has adequately pled negligence on the part of Dorsey in failing to identify the conflicts of interest inherent in the various transactions between Crescent, Helicon and the individual defendants.

The question therefore is whether the facts alleged are sufficient to state a claim that Dorsey "materially assist[ed]" the primary actors in their alleged misrepresentations and omisssions. Aid is "'material" if it '"has a natural tendency to influence, or was capable of influencing, the decision of' the purchaser." *Connecticut Nat'l Bank*, 699 A.2d at 122 (internal quotations omitted). In *Connecticut Nat' Bank*, the Connecticut Supreme Court found that employees of a bank had provided material assistance to the fradulent conduct of a seller of the securities when they had met with the purchases of the securities, endorsed the seller, and stated to the purchasers that the bank was confident in the

investment. *See Connecticut Nat'l Bank*, 699 A.2d at 122-23 (statements to potential buyer that investment was "a home run," a "pretty good project and everyone should make some money," and the bank "fully endorsed" the project held sufficient to constitute material assistance).

The facts alleged in the complaint here as to Dorsey, however, fall far below the standard set forth in *Connecticut Nat'l Bank*. Dorsey is merely alleged to have been providing standard legal services to its client, the underwriters, and is not alleged to have engaged in any activity aimed at influencing the purchasers of the securities. The parties have cited no cases, and the Court has found none, which construed the drafting of an Offering Statement to be sufficient to impose liability under Conn. Stat. § 36b-29, and the Court is not persuaded that such conduct constitutes "material assist[ance]" for purposes of the statute. The Court therefore finds that the plaintiffs have failed to allege a claim against Dorsey under Conn. Stat. § 36b-29 and the Fourth Claim for Relief will be dismissed as to that defendant.

b. <u>Texas Civ. Stat. Ann. § 581-33(A)(2)</u>

The Texas statute, Section 581-33(A)(2), imposes liability on a person who "offers or sells a security" by means of an untrue statement or an omission of a material fact, or who "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security . . .." The complaint does not allege facts that establish liability as an offerer or seller as to Dorsey under the statute, which requires that the defendant be either "the person who sold the security directly to the purchaser or who acted as the vendor's agent and solicited the sale." *In re Enron Corp. Sec. Deriv. & Erisa Litig.*, 540 F. Supp. 2d 759, 767 (S.D. Tex. 2007). A

defendant is only an agent of a seller under Texas law if the seller had a right of control over it. *Id.* Dorsey thus is not liable as a primary violator under the Texas statute.

Plaintiffs assert that Dorsey can be held liable under section 581.33(A)(2) because the complaint alleges that Dorsey "materially aid[ed]" the omissions and misrepresentations of the offerers and sellers of the securities. There is no clear authority in Texas imposing liability pursuant to section 581.33(A)(2) on an attorney that drafted an Official Statement. The Court does not need to reach this issue, however, because it is clear that section 581.33(A)(2) is a fraud statute and does impose a requirement on the plaintiff to plead scienter, which the plaintiffs here have not adequately alleged. S*ee supra*, section IA.

In *Sterling Trust Co. v. Adderly*, 168 S.W.3d 835, 841 (Tex. 2005), the Texas Supreme Court interpreted the scienter requirement for section 581.33(A)(2) as requiring at a minimum recklessness, defined as rendering assistance "'in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by the primary violator." *Sterling Trust*, 168 S.W.3d at 837. This is a standard that is at least as strict as the scienter required to be alleged for a 10b-5 violation. The *Sterling Trust* court specifically rejected a standard that would impose liability for "preparing financial statement...or giving legal advice." *Sterling Trust Co.*, 168 S.W. 3d at 842 (quoting Ruder, Multiple Defendants in Securities Law Fraud Cases, 120 U. Pa. L. Rev. 597, 632-33 (1972)). As with the federal securities fraud claims discussed, *supra*, in section IA, the facts alleged in the complaint fail to create an inference that members of the Dorsey firm were either subjectively aware of the alleged improper activity, or reckless about its existence, and therefore fails to state a claim for violation of Tex. Civ. Stat. 581-33(A)(2). The Fifth Claim for Relief will thus be dismissed as to Dorsey.

C. Do plaintiffs' common law aiding and abetting claims fail to state a claim?

Dorsey has also moved to dismiss the Tenth Claim for Relief, which alleges that Dorsey and the other defendants aided and abetted the fraudulent statements and omissions of Defendants Helicon, Witucki and Gilliam. Dorsey argues that the plaintiffs' aiding and abetting common law fraud claims fail as to Dorsey because Fed. R. Civ. P. 9(b) requires fraud claims to be pled with particularity.

> When a plaintiff charges more than one defendant with fraud, Rule 9(b) requires that the plaintiff specify as to each defendant what was said, in what form, to whom, when and where, and the respect to which the statement was fraudulent.

*Chase Bank of Texas, N.A. v. Grant Thornton, LLP*, No. 236237, 2003 WL 21350362 at *4 (Mich. Ct. App. June 10, 2003) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1992)). To state a claim for aiding and abetting the making of fraudulent statements and omissions, the plaintiff must show "the alleged abettor [had] the same degree of scienter as the person committing the actual fraud." *Id.* (interpreting MCR 2.112(B)(1)).

Dorsey argues that here the plaintiffs do not allege facts showing that Dorsey acted with any degree of scienter, but only allege that the firm knew or should have known about the misrepresentations and omissions in the Official Statement and therefore the complaint fails to state a claim for aiding and abetting fraud against Dorsey. These are the same type of allegations made by the plaintiffs in *Chase Bank of Texas*, which the Michigan Court of Appeals specifically rejected as sufficient to state a claim for aiding and abetting common law fraud under Michigan law. The Court agrees that allegations here do not sufficiently allege scienter as to Dorsey and thus do not state a claim for aiding and abetting common law fraud. The Tenth Claim for Relief will therefore be dismissed as to Dorsey.

D. <u>Negligent Misrepresentation Claims</u>

Finally, Dorsey has moved to dismiss as to Dorsey plaintiffs' claims of negligent misrepresentation contained in the Ninth Claim for Relief. A claim for negligent

misrepresentation under Michigan law requires proof that the plaintiff "justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *The Mable Cleary Trust v. The Edward-Mariah Muzyl Trust*, 262 Mich. App. 485, 502 (2004). "In determining whether the relationship between the parties is sufficient to establish a duty, the proper inquiry is "whether the defendant is under any obligation for the benefit of the particular plaintiff . . . . This analysis concerns whether the relationship of the parties is of a sort that a legal obligation should be imposed on one for the benefit of another." *Alpha Title Agency Inc. v. Peoples State Bank*, No. 243508, 2004 WL 576663 at *2 (Mich. Ct. App. March 23, 2004) (quoting *Buczkowski v. McKay*, 490 N.W.2d 330 (Mich. 1992) (other citations omitted)).

Dorsey argues that plaintiffs' negligent misrepresentation claim against Dorsey fails because Michigan law does not recognize a claim for negligent misrepresentation based upon purported misstatements in public offering materials. In support of this proposition, Dorsey relies upon *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583 (E.D. Mich. 1985) (Joiner, J.). The court in *Consumers Power Co.* stated that negligent misrepresentation claims in Michigan are limited to actions involving closely-held corporations with a limited number of potential investors, because "recognizing a cause of action for negligent misrepresentation [against a large, public company] would expose defendants to a virtually unlimited amount of liability to any member of the public who happened to buy [the company's stock] during a given period." *Id.* at 597.[4] *Accord In re*

---

[4]Plaintiffs argue that this case is distinguishable from *Consumer Powers* because here, there is not potentially unlimited liability to unlimited potential plaintiffs. They point out that Dorsey could easily foresee that a limited number of identifiable institutional investors would purchase the Bonds because its client, Sims, had identified the Funds as purchasers of the Bonds and had sent them a Preliminary Official Statement prior to the issuance of the Bonds. Plaintiff also points out that just four entities collectively purchased $6,520,000 in face value of the Bonds. Plaintiffs argue that there was here a discrete and readily

*F& M Dist., Inc. Sec. Litig.*, 937 F. Supp. 647, 658 (E.D. Mich. 1996) (Cook, J.); *In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1261 (W.D. Mich. 1991) (Hillman, J.).

The Sixth Circuit has spoken on this issue and the Court is required on that basis to deny Dorsey's motion to dismiss the negligent misrepresentation claim. In *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910 (6th Cir. 1991), the Sixth Circuit determined that an attorney and law firm could be held liable for negligent misrepresentations made in marketing circulars for debentures. In *Molecular Tech.*, Snyder, an attorney-defendant, received an initial offering circular from the company's corporate counsel, reviewed it, amended portions and returned it to the company. *Molecular Tech.*, 925 F.2d at 916. On Snyder's appeal of a jury verdict in plaintiff's favor, the Sixth Circuit found that a reasonable jury could conclude that the attorney knew or should have known that investors such as the plaintiffs would be shown the amended offering circular, and that Michigan law "imposes a duty in favor of all those third parties who defendant knows will rely on the information *and* to third parties who defendant should reasonably foresee will rely on the information." *Id.* at 915 (emphasis original). As relevant here, the Sixth Circuit explicitly rejected jury instructions drafted by the district court which incorporated the *Consumers Power* standard that limited the class of plaintiffs in a negligent misrepresentation claim. In doing so, the Sixth Circuit found that the seminal Michigan case on the tort of negligent misrepresentation, *Williams v. Polgar,* 391 Mich. 6 (1974), "does not required that the plaintiff have 'a link . . . such as privity, a bond approaching privity or a fiduciary relationship ' with the defendant in order for a duty of reasonable care to exist." *Molecular Tech.*, 925 F.2d at 916. This is precisely the standard applied by the district court in *In re Consumer*

---

identifiable number of purchasers in the primary market, and that Dorsey was not confronted with potentially unlimited liability to an unlimited number of plaintiffs.

*Power.*  See *In re Consumer Power*, 105 F.R.D. at 597 (applying the reasoning of *Ultramares v. Touche*, 255 N.Y. 170 (1931), which permitted liability for negligent misrepresentation only "where there is a link between plaintiff and defendant to limit the potential liability and to make its imposition more just.  These links include privity, a bond so close as to approach privity, or a fiduciary duty").[5]

This Court is obliged to apply the ruling of the Sixth Circuit in *Molecular Tech.* that Michigan law does recognize a cause of action by reasonably foreseeable plaintiffs for negligent misrepresentation against an attorney who is alleged to have negligently participated in the drafting of offering materials in a debt offering.  Dorsey's attempts to distinguish *Molecular Tech.* from the present case are unpersuasive.  The Court will therefore deny Dorsey's motion to dismiss plaintiff's claim of negligent misrepresentation under Michigan law.

II.    CRESCENT ACADEMY'S MOTIONS TO DISMISS THIRD PARTY COMPLAINTS

The Underwriters and Darnell have each filed third party complaints against Crescent Academy, asserting claims based in contract, indemnity, tort and unjust enrichment. Crescent has filed motions to dismiss both third party complaints.  In its motions to dismiss, Crescent argues that Michigan governmental immunity bars all tort claims for misrepresentation, negligence and contribution; that the third party claims for breach of contract and indemnity fail because Crescent lacked the power to indemnify; and that the claims for unjust enrichment fail because, Crescent argues, there are express contracts

---

[5]The Court in *In re Rospatch Securities Litig.*, 760 F. Supp. 1239 *(*W.D. Mich. 1991*)* distinguished  *Molecular Tech.* on the grounds that *Molecular Tech.* involved a small, closely-held corporation with only three investors, and declined to extend to a case involving a large number of potential investors.  This Court, however, does not find the distinction made in *In re Rospatch* to be persuasive.  The Sixth Circuit did not rely on the number of investors to find the attorney's conduct actionable, and nothing in *Polgar* limits a cause of action in negligent misrepresentation to closely held corporations.

covering the subject matter of this claim.  For the reasons stated below, the Court agrees and will grant Crescent's motions and will dismiss both third party complaints.

A.  Does Michigan Governmental Immunity Bar the Underwriters and
Darnell's Claims for Misrepresentation, Negligence and Contribution?

Crescent moves to dismiss Count II (misrepresentation), Count III (negligence) and Count IV (contribution) of the Underwriters' Third Party Complaint, and Count III (misrepresentation), Count IV (negligence) and Count V (contribution) of Darnell's Third Party Complaint, because, Crescent asserts, all tort-based claims of misrepresentation, negligence and contribution are barred by the Michigan law.

The Government Tort Liability Act, Mich. Comp. Laws 691.1407, grants immunity to governmental agencies for tort liability if the agency "is engaged in the exercise or discharge of a governmental function." Mich. Comp. Laws 691.1407(1).  Crescent argues that public schools are included in the definition of immune "government agencies" by virtue of being agencies and political subdivisions of the State of Michigan, and under Mich. Comp. Laws 380.501 and 503, which state that a public school academies are government agencies and that they and their incorporators, employees and others have governmental immunity as provided in Mich. Comp. Laws 691.1407.  Crescent argues that "governmental function" has been broadly construed to "encompass most of the activities undertaken by governmental agencies." *Hyde v. Univ. of Michigan Bd. Of Regents*, 426 Mich. 223, 243 (1986) (quoting *Ross v. Consumer Powers Co.*, 420 Mich. 567, 621 (1984)) and that the construction encompasses the alleged negligence and misrepresentation at issue here. Neither the Underwriters nor Darnell assert that the acts at issue here were not engaged in by Crescent in the discharge of a government function, so the Court will presume that they were.

### 1. Underwriter's argument - Crescent Waived Immunity

The Underwriters argue that Crescent has waived its governmental immunity in the context of its financing transactions with the Underwriters. The Underwriters argue that Crescent's power to waive its governmental immunity is "implied or incident to" its power under Mich. Comp. Laws 380.504a to enter into "binding legal agreements," and that Crescent waived its governmental immunity by implication when entering into the financing agreements.

Crescent argues in response that governmental immunity is one of the "characteristics of government" and therefore cannot be waived by a governmental agency's conduct. *Mack v. City of Detroit*, 467 Mich. 186, 199-200 (2002). The Court finds that *Mack* is dispositive of this issue. In *Mack*, the Michigan Supreme Court held that the Charter of the City of Detroit could not create a private right of action against the City for discrimination on the basis of sexual orientation because such an action would contravene the Governmental Tort Liability Act. *Mack*, 467 Mich. at 194-95. The Michigan Supreme Court specifically held that government agencies are immune unless the legislature has removed the "veil" of sovereign immunity and that the governmental agency itself is powerless to do so. *Id.* Given the broad holding in *Mack* that a government agency is powerless to remove the veil of sovereign immunity, the Court now finds that Crescent did not implicitly waive its governmental tort immunity by entering into the financing agreements. The Underwriters' tort-based claims for misrepresentation, negligence and contribution will be dismissed.

### 2. Darnell's Argument - Misrepresentation, Negligence and Contribution Claims are Contract Claims, Not Tort Claims

Darnell cites *Ross v. Consumers Power Co.*, 420 Mich. 567, 693 (1984), for the proposition that Mich. Comp. Laws 380.503(7) grants immunity from tort liability, not for contract liability. Darnell argues that its misrepresentation, negligence and contribution claims are based in contract, not tort, and therefore are not barred by governmental immunity.

The Court disagrees. The misrepresentation, negligence and contribution claims asserted in Darnell's third party complaint are claims traditionally construed as tort claims. See Restatement (Second) Torts § 525 (Fraudulent Misrepresentation); § 552 (Negligent Misrepresentation); § 23 (Contribution), and Darnell does not provide the Court with any authority for construing them as contract claims.

The Court will therefore grant Crescent's motion to dismiss Counts II (Misrepresentation), III (Negligence) and V (Contribution) of the Underwriters' Third Party Complaint and Count III (Misrepresentation), Count IV (Negligence) and Count V (Contribution) of Darnell's Third Party Complaint on the grounds of governmental immunity.

### B. Did Crescent Lack the Power to Indemnify the Underwriters?

Crescent argues that the Underwriters' claim for express indemnification should be dismissed because Crescent lacked the power to enter into the indemnification agreement. Crescent does not deny that it entered into an explicit agreement with the Underwriters agreeing to indemnify them for any losses resulting from untrue or incorrect information in the Official Statement. Crescent argues, however, that the agreement is unenforceable because, as a public school academy, it lacked the power to enter into such an agreement. The Court agrees, for the reasons stated below, and will grant Crescent's motion to dismiss the Underwriters' indemnification claim.

Public school academies are governmental agencies. Mich. Comp. Laws 380.501(1). A governmental agency has no inherent powers, and can only exercise those powers that have been conferred upon it by the Michigan Constitution and valid statutes. *McIlmurray v. Office of Racing Comm'r*, 130 Mich. App. 271, 277 (1983); *see also Michigan Mun. Liability and Property Pool v. Muskegon County Bd. of County Road Commissioners*, 235 Mich. App. 183, 190 (1999) (local governmental units "have no inherent powers and possess only those limited powers which are expressly conferred upon them by the state constitution and valid state statutes or which are necessarily implied therefrom") (quoting *Hanselman v. Wayne Co. Concealed Weapon Licensing Bd.*, 419 Mich. 168, 187 (1984)). A power is "necessarily implied" when it is essential to the exercise of authority that is expressly granted. *Conlin v. Scio Twp.*, 262 Mich. App. 379, 385 (2004).

The powers of a public school academy are set forth in Mich. Comp. Laws 380.501 *et seq.* The statute does not expressly grant public school academies the power to enter into indemnification agreements. See Mich. Comp. Laws 380.501 *et seq.* Crescent therefore may only enter into an indemnification agreement if that power is necessarily implied from a power that is expressly granted to public school academies. The question of whether Crescent's power to enter an agreement here may be implied is determined by using the usual tools of statutory interpretation to ascertain and give effect to the intent and purpose of the legislature. *Michigan Mutual*, 235 Mich. App. at 189.

The Underwriters argue that the power to enter into indemnification agreements is necessarily implied from the powers given to public school academies in section 504a of the revised school code to "enter into binding legal agreements with persons or entities as necessary for the . . . financing . . . of the public school academy," Mich. Comp. Laws

380.504a(d), and the power to "borrow money and issue bonds in accordance with section 1352(a) . . . ." Mich. Comp. Laws 380.504a(g).

The only Michigan case that has dealt with the power of a public school to enter into an indemnification agreement is *Huntington Leasing Co. v. Manistee Intermediate School Dist.*, No. 250492, 2005 WL 991309 (Mich. App. April 28, 2005). In that case, the Michigan Court of Appeals found that the power to indemnify was not necessarily implied from the power to hire employees, independent contractors and other third parties. In *Huntington Leasing*, the Manistee Intermediate School District (MISD) entered into a relationship with a service provider to Local Internet Services (LIS) to proved equipment and services to the school district, which the school district used to sell internet services at a profit. The superintendent of the school district agreed to secure financing for the equipment from Huntington Leasing Co. (Huntington) and also signed an indemnity agreement on behalf of MISD, under which the school district agreed to indemnify an attorney who wrote an opinion letter, which (incorrectly) opined that the school district's conduct in obtaining the financing was legal. When the school district was sued by Huntington for breach of contract, the school district sued the attorney, Mr. Kivela, for legal malpractice, and Kivela countersued MISD for indemnification pursuant to the indemnification agreement.

The trial court granted MISD summary disposition on Kivela's indemnification claim, and the Court of Appeals affirmed, on the grounds that the indemnification agreement was an ultra vires act. The Court of Appeals held that local governmental units such as school boards do not have inherent powers, but only those "limited powers which are expressly conferred by the state constitution or state statutes or necessarily implied therefrom." *Huntington*, 2005 WL 991309 at * 2 (*quoting Michigan Municipal Liability & Prop. Pool v. Muskegon Co. Bd. of Co. Rd. Comm'rs*, 235 Mich. App. 183, 190 (1999) (other citations

omitted)).  The Court of Appeals held that the statute that gave intermediate school districts their implied and incidental powers did not explicitly give such school districts the authority to enter into an indemnity agreement such as the one at issue here, and the power to indemnify was not necessarily implied from the power to hire employees, independent contractors and other third parties.  *Id.* at * 3.  The court noted in particular that the statute explicitly gave the school districts the power to indemnify its employees but said nothing about the power to indemnify others and the court "must assume that this omission was intentional."  *Id.*[6]

The Underwriters point out that *Huntington Leasing* is an unpublished, *per curiam* opinion by the Michigan Court of Appeals, is therefore not binding precedent, and further argue that it is distinguishable both on its facts and on the law.  The Underwriters argue that the indemnification agreement in *Huntington Leasing* involved an agreement to indemnify an attorney for his own malpractice, whereas the indemnification agreement here was for Crescent to indemnify the Underwriters for Crescent's own factual representations, made with the full knowledge and consent of Crescent's board.  Further, the Underwriters argue, *Huntington Leasing* involved an intermediate school district rather than a public

---

[6]Sec. 601a. (1) An intermediate school district has all of the rights, powers, and duties expressly stated in this act; may exercise a power implied or incident to any power expressly stated in this act; and, except as provided by law, may exercise a power incidental or appropriate to the performance of any function related to the operation of the intermediate school district in the interests of public elementary and secondary education in the intermediate school district, including, but not limited to, all of the following:
...

(d) Hiring, contracting for, scheduling, supervising, or terminating employees, independent contractors, and others to carry out intermediate school district powers. An intermediate school district may indemnify its employees.
...

Mich. Comp. Laws 380.601a

school academy, and therefore involved a different empowering statute, Mich. Comp. Laws 380.601a, rather than the statute at issue here, Mich. Comp. Laws 380.504a, which identifies the powers granted to public school academies like Crescent.[7]

The Court agrees with the Underwriters that *Huntington Leasing* is not fully on point because the court there found that the power to indemnify was not implied from the power to hire independent contractors such as the attorney who prepared the opinion letter in that case. The Underwriters argue here that the power to indemnify is implied from the powers conferred by Mich. Comp. Laws 380.504a(d) "[t]o enter into binding legal agreements with persons or entities as necessary for the . . . financing . . . of the public school academy" and from 380.504a(g) to "borrow money and issue bonds in accordance with section 1351(a) . . ."

Recognizing the merits of the Underwriters' arguments, the Court is still not persuaded that the power to enter into an indemnification agreement with an underwriter is necessarily implied from the power to enter into financing agreements and the power to borrow money and issue bonds. Michigan courts are reluctant to find implied powers. *See Michigan Mutual*, 235 Mich. App. at 193 ("we will not infer a power that is not essential to the proper

---

[7]     In support of this argument, the Underwriters cite *Cain v. Lansing Housing Comm'n*, 235 Mich. App. 566 (1999). In *Cain*, the defendant commission had entered into an annual financing contract with the Federal Department of Housing and Urban Development (HUD) in which the HUD required the commission to waive its sovereign immunity in order to secure HUD funds. The court of appeals held that the power to waive its sovereign immunity was implied by the authorization in Mich. Comp. Laws 125.969, which authorizes municipal housing authorities to do any and all things necessary to secure the financial aid or cooperation of the federal government in housing facilities, and one of the "things necessary" to secure HUD funds was to accept all contract terms that HUD deems appropriate in order to provide federal financial assistance. *Cain*, 235 Mich. App. at 569. The holding in *Cain*, however, would appear to have been overruled by *Mack's* holding that a governmental entity cannot waive immunity by its own action, because governmental immunity is a "characteristic of government."

exercise of expressly conferred authority"), and the power to indemnify is not inherent in government entities. *Wheeler v. City of Sault Ste. Marie*, 164 Mich. 338 (1911). The Court has come across no Michigan case finding the power to indemnify implied from any power expressly conferred on a governmental agency. Rather, the few Michigan cases that have addressed the issue have found that the power to indemnify was not implied from the express powers given to the local government entities and governmental agencies. *See Michigan Mutual*, 235 Mich. App. at 188 (power to enter into indemnification agreement as a condition to hiring an engineer or consultant not necessarily implied from county road commission's power to hire such professionals); *Huntington Leasing*, 2005 WL 991309 at * 2 (power to enter into indemnification agreement with attorney not necessarily implied from power to hire employees, independent contractors and other third parties). The Court also notes that there is authority for the proposition that indemnification agreements that purport to indemnify underwriters for federal securities violations are void as a matter of public policy. *See, e.g., Heizer Corp. v. Ross,* 601 F.2d 330, 334 (7th Cir. 1979); *Globus v. Law Research Serv., Inc.*, 287 F. Supp. 188, 199 (S.D.N.Y. 1968), *rev'd in part on other grounds,* 418 F.2d 1276 (2d Cir. 1969). While not directly applicable to these state law issues, this undercuts the Underwriters' argument that such indemnifications are "necessary" to obtaining financing and issuing bonds.

The Court finds that the power to bind itself to the instant indemnification agreement is not necessarily implied by or incident to the powers expressly granted to public school academies in Mich. Comp. Laws 380.504a(d) and (g) to enter into binding legal agreements as necessary for its financing and to borrow money and issue bonds. Crescent's motion to dismiss the Underwriters' indemnification claim will therefore be granted.

C. Should Darnell's Breach of Contract Claims be Dismissed?

There is no express indemnification agreement between the Darnell CFA Firm and Crescent. The Darnell CFA Firm's Third Party Complaint against Crescent contains two breach of contract claims but no claim pursuant to an express indemnification agreement between the Darnell CFA Firm and Crescent. Nonetheless, Crescent argues that the Darnell CFA Firm's breach of contract claims should be construed as claims for indemnification and should be dismissed for the same reasons that the Underwriters' indemnification claim should be dismissed. Crescent argues, alternatively, that the breach of contract claims should be dismissed because the element of damages is not adequately alleged in the third party complaint. Finally, Crescent argues that the second breach of contract claim should be dismissed because the Michigan Accountant Liability Act does not support a claim in favor of an accountant against its client.

Count I of the Darnell Firm's third-party complaint asserts that Crescent, in its contract with Darnell, represented that it had reviewed, approved and accepted responsibility for the Financial Statements and related notes and acknowledged and agreed that it was responsible for the fair presentation of the Financial Statements in conformity with generally accepted accounting principles (GAAP). Darnell alleges that, under its contract, Crescent was also responsible for identifying and disclosing all related party transactions, and to the extent that the financial statements are found to contain material omissions or are false and misleading on account of Crescent's failure to disclose the School Building Lease as a related party actions, then Crescent is contractually liable for any resulting damages. Count I of the Darnell CFA Firm's third party complaint also asserts that Crescent Academy was contractually responsible for identifying and ensuring compliance with all applicable laws and regulations and that Crescent affirmatively represented in its contract with Darnell that there were no violations or potential violations.

Crescent argues that Darnell's breach of contract claims should be construed as indemnification claims because Darnell's only allegations of damages is that it may suffer them in the event Darnell is found liable to the plaintiffs in the original action. Crescent argues that damages are an essential element of any breach of contract action, and because Darnell currently has no damages, its claim for breach of contract is correctly construed as a claim for indemnification. Darnell argues in response that the agreements between it and Crescent were not indemnity agreements, which are defined as a contract or assurance by which one person engages to secure another against an anticipated loss or to prevent him from being damaged by the legal consequences of an act or forbearance on the part of one of the parties or of some third party. Rather, Darnell argues that Crescent agreed in its contracts with Darnell to perform certain acts that it failed to do and as a result Darnell was damaged. Darnell argues that the result of accepting Crescent's arguments would be to insulate a government entity from the consequence of breach of contract, and the Michigan Supreme Court has stated that government entities are not immune from breach of contract suits in *Ross v. Consumers Power Co.*, 420 Mich. 567 (1984).

The Court finds that Darnell's failure to allege that it has sustained damages as a result of Crescent's alleged breach requires dismissal of Darnell's breach of contract claims. Damages are an element of a breach of contract claim under Michigan law. *Alan Custom Homes, Inc. v. Krol*, 256 Mich. App. 505, 521 (2003). The only allegations concerning damages contained in Darnell's third party complain are that "[i]n the event that Darnell & Meyering, P.C. are found liable to Plaintiffs in the original action, Darnell & Meyering, P.C. will have suffered damages as a direct and proximate cause of Crescent Academy's breaches of contract." Darnell Third -Party Complaint at ¶¶ 18, 25. While Fed.

Civ. P. 14(a) provides a mechanism for defendants to file third party complaints against a non-party "who is or may be liable to it for all or part of the claim against it," the rule does not alter the substantive requirements of pleading claims under state law. *Roe v. Bryant & Johnson Co.*, 193 F. Supp. 804, 805 (E.D. Mich. 1961). To the extent that Darnell seeks to be protected from future losses, that would constitute an indemnity claim, not a breach of contract claim. See *Melbourne v. Lawn Works*, 2007 WL 675395 at * 5 (Mich. Ct. App. March 6, 2007) (indemnity applies irrespective of whether party seeking to be indemnified suffers actual loss). Darnell's third party complaint fails to allege that Darnell has already suffered damage as a result of Crescent's alleged breach and therefore Counts I and II fail to state a claim for relief.

Count II of the Darnell CFA Firm's third party complaint asserts a second claim of breach of contract based upon the engagement letter between Darnell and Crescent. In Count II, Darnell asserts that Crescent breached its contract with Darnell by using the Financial Statements for purposes inconsistent with that contract and that Crescent violated the Michigan Accountant Liability Act, Mich. Comp. Laws 600.2962, by failing to disclose that Crescent intended to include the Financial Statements in an Official Statement for the purposes of selling securities. Crescent argues that the Michigan Accountant Liability Act does not support a claim in favor of an accountant against its client. Darnell does not respond to this argument in its response and it may be deemed admitted, which is an additional reason for granting Crescent's motion to dismiss Count II of Darnell's Third Party Complaint.

D.  Should the Claims for Unjust Enrichment be Dismissed?

Crescent argues that the claims for unjust enrichment in Count VI of both the Underwriters' and Darnell's third party complaints should be dismissed because there is an

express contract covering the same subject matter and because the complaint fails to allege all the elements of a claim of unjust enrichment under Michigan law.

Unjust enrichment is an equitable doctrine, under which a person who has been unjustly enriched at the expense of another is required to make restitution to the other. *Estate of McCallum*, 153 Mich. App. 328, 335 (1986). The courts will only imply a contract if there is no express contract covering the same subject matter. *Belle Isle Grill Corp. v. City of Detroit*, 256 Mich. App. 463, 478 (2003). A plaintiff who has an express contract with a defendant, however, may bring a claim for unjust enrichment against that defendant if the subject matter of the parties' express contract is not the same as the subject matter of the contract to be implied in order to avoid unjust enrichment. *Cascade Electric Co. v. Rice*, 70 Mich. App. 420, 426 (1976).

Crescent argues in the first instance that Darnell's and the Underwriters' claims for unjust enrichment should be dismissed because there is an express contract covering the same subject matter as the claim for unjust enrichment. The Court disagrees and finds that the subject matter of both unjust enrichment claims differs from the subject matter of the breach of contract claim. The subject matter of the breach of contract claims is the 2006 bond transaction in which the Underwrites and Darnell were directly involved, while the subject matter of the unjust enrichment claims is the subsequent transaction (with which neither the Underwriters nor Darnell were involved) in which Crescent and the Bondholders agreed that Crescent would unwind the previous bonds, issue replacement bonds totaling $3,200,000.00, be relieved of any obligation to repay the Bondholders the $3,800,000 difference between the two bond issues and leave the Bondholder to sue the defendants for that money. The Underwriters and Darnell argue that it would be unjust to permit Crescent to retain this benefit if the Underwriters and Darnell have to pay that same

amount in damages to the Bondholders as a result of Crescent's misrepresentations and omissions.

Crescent raises in its reply a second argument in support of its motion to dismiss the unjust enrichment claim. In its reply, Crescent argues that the Underwriters' argument in their response brief shows that they cannot establish that the defendant received a benefit from the plaintiff. The elements of a claim of unjust enrichment are (1) the receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by the defendant. *Belle Isle Grill Corp.*, 256 Mich. App. at 478. Crescent argues that the alleged benefit came from the Bondholders allowing Crescent to retain the money from the initial bond offering rather than from the Underwriters, and therefore unjust enrichment does not apply. The Underwriters have not responded to this argument because it appears for the first time in Crescent's reply brief. Ordinarily the court may refuse to reach issues raised for the first time in a reply brief on the grounds that such issues are not properly before the court. *United States v. Lopez-Medina*, 461 F.3d 724, 743 n.4 (6th Cir. 2006). The Court, however, held a hearing on the motion, at which time the Underwriters had an opportunity to respond to the argument, and there was some briefing following the hearing on other issues. The Court finds that the record before it is adequate to determine the issue and it would be inefficient to ignore the argument, because it is clear that neither the Underwriters nor Darnell have a claim for unjust enrichment under Michigan law.

The facts alleged in the third party complaints do not state a claim for unjust enrichment against Crescent, because there is no allegation that Crescent received a benefit directly from the third party plaintiffs. The benefit that both Darnell and the Underwriters claim that Crescent received is the $3,890,000 value that Crescent received

when the bondholders agreed to unwind the initial Certificates of Participation without requiring Crescent to return the money Crescent received from those Certificates. That money did not come from either the Underwriters or Darnell, but rather from the bondholders, and both the Underwriters and Darnell were paid for their services to Crescent. The third party complaints do not allege that Crescent obtained a benefit from the third party plaintiffs and therefore fail to state a claim for unjust enrichment. Crescent's motion to dismiss Count VI of the Underwriters' third party complaint and Count VI of Darnell's third party complaint will therefore be granted.

III.   JEREMY GILLIAM'S MOTION TO STAY ACTION BECAUSE OF BANKRUPTCY

On August 3, 2009, defendant Jeremy Gilliam filed a Chapter 7 petition for bankruptcy. He has also filed a motion in this action to stay all proceedings against him due to the bankruptcy. The automatic stay of 11 U.S.C. § 362(a)(1) applies to stay all proceedings against a defendant during the pendency of a bankruptcy, subject to certain exceptions not relevant here. No party has opposed Gilliam's motion and the Court will therefore grant Gilliam's motion to stay all proceedings as to him during the pendency of his bankruptcy .

IV.   DEFENDANTS' MOTION TO STAY ACTION DUE TO GILLIAM'S BANKRUPTCY.

Defendants Witucki and Helicon have moved for an order of this Court staying this litigation while Jeremy Gilliam's bankruptcy is pending. Defendants acknowledge that ordinarily 11 U.S.C. § 362(a)(1) does not stay a matter as to solvent co-defendants in a civil matter. In *Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1196 (6th Cir. 1983), the Sixth Circuit affirmed the district court's refusal to stay an action against joint tortfeasors of a Chapter 11 debtor. In so doing, the court held that section 362(a) "fails to intimate, even tangentially, that the stay could be interpreted as including any defendant other than

the debtor . . .  It is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantor, co-obligators or others with a similar legal or factual nexus to the Chapter 11 debtor." *Lynch*, 710 F.2d at 1196.  Extending a stay to non-bankrupt co-defendants is justified only in "unusual circumstances." *In re Delta Airlines*, 310 F.3d 953, 956 (6th Cir. 2002).  "Unusual circumstances"  may include "when the debtor and the non-bankrupt party are closely related or the stay contributes to the debtor's reorganization." *Patton v. Bearden*, 8 F.3d. 343, 349 (6th Cir. 1993).

The plaintiffs point out that the Sixth Circuit has stated that extensions of the automatic stay to non-debtor parties, "although referred to as extensions . . . were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate." *Patton*, 8 F.3d at 348.  Plaintiffs argue therefore that the protection the defendants seek should be issued by the bankruptcy court, not the district court, because the automatic stay seeks to protect the parties in the bankruptcy action, not to protect the solvent co-defendants in a civil suit.  The Court agrees that it does not have the power to extend the automatic stay to the non-bankrupt codefendants, and that such power resides with the bankruptcy court.

Defendants Witucki and Helicon argue, however, that the Court should stay this matter as to them based upon the Court's inherent power to stay to control its docket.  The federal court's power to stay its proceedings in the interests of docket control was set out in *Landis v. North American Co.*, 299 U.S. 248 (1936), in which the Supreme Court held that district courts had the power to stay, using the exercise of judgment, balancing competing interests, but that courts should exercise this power carefully and reluctantly.

Witucki and Helicon rely primarily on *Stoller v. Baldwin-United Corp.*, 41 B.R. 884 (S.D. Ohio 1984), a case in which a district court in the Southern District of Ohio imposed a limited stay during a defendant's bankruptcy pursuant to the Court's inherent power to control its docket. *Stoller* was a securities case involving allegations of market fraud against two Chapter 11 debtors, which was at the time perhaps the largest bankruptcy case in American history, as well as several other corporations. The district court conducted a balancing test in which it considered potential damage to the reorganization, the small benefit to the plaintiffs of going forward while the bankruptcy was continuing, and concluded that a temporary stay of six months as to the non-debtor defendants was appropriate to (1) minimize the effect of the adversary litigation on the reorganization proceedings; (2) permit the Court to determine the motions to dismiss presently before it; (3) defer briefly to the bankruptcy examiner who was examining the same securities fraud claims at issue in the adversary proceeding; (4) permit some of the reorganization proceedings to complete in the stay period; and (5) due to the involvement of the director/defendants in the reorganization proceedings. *Stoller*, 41 B.R. at 892-93.

Plaintiffs argue, correctly, that *Stoller* is highly distinguishable from the present case. First, they point out that this case, which involves an individual's bankruptcy, is very different from *Stoller*, which involved perhaps the largest bankruptcy in history at that point. Second, the co-defendants in *Stoller* were directors of the bankrupt defendant corporations, were actively involved in the debtor companies' reorganization efforts, and whose efforts in the reorganization would be hampered due to the demands placed upon them in defending themselves in the related case. Third, the court in *Stoller* made a finding, based upon the bankruptcy judge's finding, that a stay would actually benefit the plaintiffs in *Stoller* because the bankruptcy examiner would be investigating the potential fraud committed by

the debtor companies and would therefore be developing the factual record himself. Plaintiffs point out that there is no such benefit to a stay here, because there is nothing that will occur in Gilliam's bankruptcy that will aid the plaintiffs' case. Rather, the plaintiffs argue, they will be prejudiced by a stay because of the unnecessary delay in waiting to proceed against three defendants in this litigation, which was commenced in December 2008 but in which discovery has been stayed due to the pending motions to dismiss and the automatic stay of discovery contained in the PSLRA.

The Court agrees with the plaintiffs that *Stoller* is distinguishable. Further, the Court finds that defendants have not met their burden of showing unusual circumstances that would justify staying this action as to the non-bankrupt defendants. Their arguments as to prejudice are not persuasive because the parties would be entitled to Gilliam's testimony and documents, as Gilliam's bankruptcy would not prevent the parties from deposing him, seeking documents from him, and compelling his testimony at trial under those discovery rules applicable to non-party witnesses. The fact that Gilliam would be entitled to repeat discovery when the bankruptcy stay is lifted is insufficient to establish unusual circumstances that would justify a general stay until his bankruptcy proceedings are complete. See *Lynch*, 710 F.2d at 1100 (refusing to invoke inherent power of court to stay proceedings where duplicative litigation is the congressionally-sanctioned result of bankruptcy law).

The motion to stay the entire litigation due to Gilliam's bankruptcy is therefore denied.

## VI. DEFENDANTS' EMERGENCY MOTION TO DEPOSE MICHAEL WITUCKI

This motion is moot due to the November 5, 2009 death of Mr. Witucki.

## VII. PLAINTIFFS' MOTION TO SUBSTITUTE PARTY FOR DECEASED DEFENDANT MICHAEL WITUCKI

Finally, plaintiffs have moved to substitute the Estate of Michael Witucki for Michael Witucki as party defendant under Rule 25 of the Federal Rules of Civil Procedure. The motion appears to be timely and is unopposed and will therefore be granted.

### ORDER

**WHEREFORE**, for the reasons stated above, defendant Dorsey & Whitney's Motion to Dismiss (docket number 15) is **GRANTED IN PART AND DENIED IN PART.** All claims against Dorsey & Whitney in this action are **DISMISSED** except for plaintiffs' claim of negligent misrepresentation contained in the Tenth Claim for Relief.

**IT IS FURTHER ORDERED** that the motion of third-party defendant Crescent Academy to dismiss the Underwriters' Third-Party Complaint (docket number 58) is **GRANTED**. The Underwriters' Third Party Complaint is **DISMISSED.**

**IT IS FURTHER ORDERED** that the motion of third-party defendant Crescent Academy to dismiss Defendant Darnell & Meyering, P.C.'s Third-Party Complaint (docket number 59) is **GRANTED**. Darnell & Meyering P.C.'s Third-Party Complaint is **DISMISSED.**

**IT IS FURTHER ORDERED** that Defendant, Jeremy Gilliam's Amended Motion to Stay Proceedings Due to Bankruptcy (docket number 74) is **GRANTED** and this action is **STAYED** as to defendant Jeremy Gilliam only.

**IT IS FURTHER ORDERED** that Defendants, Michael Witucki and Helicon Associates, Inc.'s Motion to Stay Proceedings Due to Defendant Jeremy Gilliam's Bankruptcy (docket number 75) is **DENIED**

**IT IS FURTHER ORDERED** that Defendants, Michael Witucki, Jeremy Gilliam, and Helicon Associates, Inc.'s Emergency Motion to Allow the Deposition of Michael Witucki (docket number 76)  is **DENIED AS MOOT**; and

**IT IS FURTHER ORDERED** that plaintiffs' motion to substitute the Estate of Michael Witucki as party defendant is **GRANTED** and the Estate of Michael Witucki is substituted as defendant in place of Michael Witucki.

**SO ORDERED**.


s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: March 15, 2010

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 15, 2010, by electronic and/or ordinary mail.

Alissa Greer
Case Manager